TABC V. TWENTY WINGS, LTD.






COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-02-102-CV
 
TEXAS ALCOHOLIC BEVERAGE   
                                                        APPELLANT
COMMISSION
V.
TWENTY WINGS, LTD. AND TWI   
                                                      APPELLEES
XXV, INC., JUDY HALL, DIRECTOR,
AS PARTNERS D/B/A HOOTERS
------------
FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
------------
OPINION
------------
I. INTRODUCTION
This case concerns an application for a beer retail dealer's on-premise
license and a retail dealer's on-premise late hours license with food and
beverage certificate ("alcoholic beverage license") by Appellee Twenty
Wings Ltd., and TWI XXV, Inc., Judy Hall Director as Partners d/b/a Hooters
("Hooters"). The Texas Alcoholic Beverage Commission
("TABC") appeals the district court's order overruling the Tarrant
County judge's administrative ruling denying Hooters' application. TABC contends
that the county judge's order was supported by substantial evidence and should
have been affirmed. We reverse and render.
II. FACTUAL AND PROCEDURAL BACKGROUND
Hooters applied for an alcoholic beverage license in conjunction with its
decision to build and open a new restaurant at 5821 IH-20 West in Arlington,
Texas. In response, Decency for Arlington, a group formed for the purpose of
opposing Hooters' application for an alcoholic beverage license, filed a letter
of protest with Tarrant County Judge Tom Vandergriff. On October 4, 2001 the
county judge sat in his administrative capacity as a hearing officer for the
TABC to determine whether Hooters' application should be granted.(1) 
At the hearing, Hooters presented one witness in support of its application. The
protestors presented six witnesses and a variety of Hooters' paraphernalia to
demonstrate that the place or manner in which Hooters may conduct its business
warranted a refusal of the alcoholic beverage license based on the general
welfare, health, peace, morals, safety, and sense of decency of the people. See
Tex. Alco. Bev. Code Ann. § 61.42(a)(3) (Vernon 1995).
After taking the matter under advisement, the county judge denied Hooters'
application by issuing an order that stated,

         On October 4, 2001, a hearing
 was held with regard to the above styled and numbered application. After
 hearing all evidence presented and reviewing the application, the court orders
 the application refused based on Sections 61.42(a)(3) of the Texas Alcoholic
 Beverage Code, the place or manner in which the applicant for a
 retail dealer's license may conduct their business warrants a refusal of a
 license based on the general welfare, morals, safety, and sense of decency of
 the people. [Emphasis supplied.]
 
 

Hooters appealed this order under section 11.67 of the alcoholic beverage
code to the 48th District Court.(2)
After an initial hearing conducted on December 28, 2001, the trial court,
with Judge Bob McCoy presiding, remanded the case to the county judge to amend
his order either to conform to the findings of fact and conclusions of law or to
amend the findings of fact and conclusions of law to conform to the order. The
order on remand further instructed the county judge to provide greater
specificity as to finding of fact number two, which concerned the proximity of
the proposed licensee's location to schools, churches, and residences. The order
allowed the county court to receive additional evidence if necessary.
The county judge complied and subsequently issued amended findings of fact
and conclusions of law, as well as an amended order stating the following:

         On October 4, 2001, a hearing
 was held with regard to the above styled and numbered application. After
 hearing all of the evidence presented and reviewing the application, the court
 orders the application refused based on Sections 61.42(a)(3) of the Texas
 Alcoholic Beverage Code. The place where the Applicant intends to
 conduct business in combination with the manner in which the
 applicant for a retail dealer's license may conduct their business warrants a
 refusal of a license based on the general welfare, morals, safety, and sense
 of decency of the people. [Emphases supplied.]
 

Hooters filed a motion for rehearing, which the county judge denied. Hooters
then filed its first amended original petition in the 48th District
Court.(3)  On February 28, 2002, visiting
Judge George Crowley conducted a hearing and rendered a final judgment reversing
the county judge's order, holding that the order was not supported by
substantial evidence.(4)
III. DISCUSSION
In one issue, the TABC argues in its appeal that the district court erred as
a matter of law in holding that the county judge's administrative ruling denying
Hooters' application was not supported by substantial evidence.(5) 
Rather, the TABC contends that substantial evidence supported the county judge's
conclusion that a special circumstance existed warranting a denial of Hooters'
application. Hooters responds that the district court properly found that no
substantial evidence justified the denial of an alcoholic beverage license as
ordered by the county judge.  We agree with the TABC.

A. Governing Statute
As one of the mandatory grounds for refusal of an alcoholic beverages permit
or license, the alcoholic beverage code lists the following:

         The county judge shall refuse to
 approve an application for a license as a distributor or retailer if he has
 reasonable grounds to believe and finds that . . . the place or manner in
 which the applicant for a retail dealer's license may conduct his business
 warrants a refusal of a license based on the general welfare, health, peace,
 morals, safety, and sense of decency of the people.

Tex. Alco. Bev. Code Ann. § 61.42(a)(3). Additionally, "in order to
deny a permit to a fully qualified applicant who proposes to operate a lawful
business in a wet area and in compliance with the zoning ordinances of the city,
some unusual condition or situation must be shown so as to justify a finding
that the place or manner in which the applicant may conduct his business
warrants a refusal of a permit." Tex. Alcoholic Beverage Comm'n v.
Mikulenka, 510 S.W.2d 616, 619 (Tex. Civ. App.--San Antonio 1974, no writ)
(footnote omitted); see Bavarian Props., Inc. v. Tex. Alcoholic Beverage
Comm'n, 870 S.W.2d 686, 689-90 (Tex. App.--Fort Worth 1994, writ denied).
B. Standard of Review
We must examine whether there was substantial evidence to support the county
judge's refusal of Hooters' application with respect to the standard set forth
in section 61.42(a)(3) of the alcoholic beverage code. See Tex. Alco.
Bev. Code Ann. § 61.42(a)(3). A recent case from the Austin Court of Appeals
succinctly sets forth how we are to conduct this review:

 In reviewing an application for a beer and wine license or permit, the
 county judge acts in an administrative rather than a judicial capacity. Lindsay
 v. Sterling, 690 S.W.2d 560, 562 (Tex. 1985). The Code does not define
 how the place or manner in which a business will be operated jeopardizes the
 general welfare, health, peace, morals, or sense of decency of the people. Brantley
 v. Tex. Alcoholic Beverage Comm'n, 1 S.W.3d 343, 347 (Tex.
 App.--Texarkana 1999, no pet.). The Legislature has given the county judge
 great discretion in this determination. Four Stars Food Mart,
 Inc. v. Tex. Alcoholic Beverage Comm'n, 923 S.W.2d 266, 272 (Tex.
 App.--Fort Worth 1996, no writ).
         In this context, county court
 proceedings are subject to the procedural provisions of the Administrative
 Procedure Act. Brantley, 1 S.W.3d at 343. We review administrative
 decisions under the substantial evidence test. Tex. Alco. Bev. Code Ann. §§
 11.67(b), 61.34. The appropriate test is whether the evidence as a whole is
 such that reasonable minds could have reached the same conclusion that the
 county court reached to justify its decision. Tex. Alcoholic Beverage
 Comm'n v. Sierra, 784 S.W.2d 359, 360 (Tex. 1990). Substantial evidence
 need only be more than a scintilla; in fact, the evidence may greatly
 preponderate against the decision and still amount to substantial evidence in
 favor of the decision. Tex. Health Facilities Comm'n v. Charter
 Medical-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984). We do not consider
 whether the county judge's ruling was correct, but only whether some
 reasonable basis exists in the record for the ruling. Sierra, 784
 S.W.2d at 361.

Tex. Alcoholic Beverage Comm'n v. Sanchez, 96 S.W.3d 483, 489 (Tex.
App.--Austin 2002, no pet.).
C. Evidence Presented at the Administrative Hearing
During the administrative hearing, Hooters presented only the testimony of
John Crowder. Crowder, apparently one of the owners of the proposed Hooters,
testified that Hooters is a nationally franchised food and beverage chain with
about three hundred restaurants nationwide. He testified that there were three
existing Hooters in Tarrant County, the first of which opened in 1989. Crowder
testified that another had been operating in north Arlington, Texas since 1990,
and according to Crowder, the north Arlington Hooters was located around two
miles from Lamar High School. Crowder further testified that the proposed south
Arlington Hooters would be operated in the same manner as the other Hooters
restaurants. For example, all of the servers and sellers of alcohol would be
TABC trained and state certified.
Crowder testified that the proposed site was in a commercial shopping center,
which had been zoned for the sale of alcoholic beverages. Crowder estimated that
there were fifty businesses in the shopping center, and ten to twelve of them
had some form of an alcoholic beverage license. Crowder further testified that
unlike restaurants such as Chili's, Bennigan's, or Steak and Ale, none of the
Hooters restaurants have a bar, so they do not sell hard liquor. Companywide,
Hooters' sales averaged about twenty-five percent alcohol and seventy-five
percent food.
The protestors presented the testimony of Jeffrey Clark, Dr. Wade Hemminger,
William Zedler, Ron Wright, and Dr. Russell Barksdale.(6) 
During the administrative proceedings, two Hooters' calendars, a deck of playing
cards, a cup, a magazine, a key chain, a computer screen saver, a yellow pages
ad, a Hooters newspaper, a map of the proposed location, and the City of
Arlington mission statement were also introduced in evidence.
Jeffrey Clark, a licensed psychotherapist and Arlington resident, testified
that he is a registered sex offender treatment provider and regularly treats
probationary and paroled sex offenders as part of his practice. Clark testified
that he had been to a Hooters before to take note of "what types of people
frequent there, what the waitresses wear, how the waitresses respond to their
patrons and the general layout of the restaurant." Clark observed that all
of the servers at Hooters wear orange shorts, which are "short enough to
expose the lower portion of their rear end." He also observed that all of
the servers wore "extremely tight" tank tops "that are cut off at
the waist to accentuate their cleavage." In describing his experience at
Hooters and comparing the demeanor of the Hooters' servers to those from more
traditional restaurants, Clark testified that the Hooters waitresses
"seemed extremely flirtatious, close in nature in terms of space," and
he stated that there was "[a] lot of bending over."
With respect to the name of the restaurant chain itself, Clark testified that
he felt the name Hooters was "a derogatory term of women's breasts."
Clark pointed out that the company logo is an owl behind the two Os in the word
Hooters, which is purportedly done to foster debate over the actual meaning
behind the chain's name. While reading from a Hooters' media statement, Clark
quoted, "[T]he element of female sex appeal is prevalent in the
restaurants," and the servers at Hooters "have the same right to use
their natural female sex appeal to earn a living" as do supermodels.
Clark testified that Hooters does not market itself to families. Clark also
testified that because of the "sexually explicit nature of [Hooters']
business, . . . their name, . . . the uniforms that they wear, . . . [and] the
merchandise they [sell]," Clark stated his belief that Hooters was selling
sexual fantasy. Clark further testified that people who are on probation or
parole for sex offenses are not allowed to possess sexually explicit merchandise
or to frequent places that may trigger sexual fantasy. Thus, according to Clark,
Hooters is the type of business that sex offenders would not be allowed to
visit.
Clark also voiced his concern that there were two high schools, Martin High
School, which he believed to be the largest in the state, and Kennedale High
School, within two miles of the proposed south Arlington Hooters. Clark
testified that because of the proximity to high schools and the fact that many
students leave campus during lunch, "some of those kids are probably going
to come [inside Hooters]." In his opinion, "[t]he danger . . . is that
we're just adding to a tremendous amount of sexual messages that our children
are getting," and Hooters would create "an undue exposure in our
neighborhood." Further, Clark testified that the proposed south Arlington
Hooters would create a safety issue, stating:

 Of course, I have no evidence, it's not there. We don't know what having
 Hooters close to two high schools, how that's going to affect the crime rate
 for that particular section of Arlington. But from my experience with other
 offenders who go into those places, I mean, we have sexual assaults outside of
 restaurants who serve alcohol, who have sexually explicit materials, topless
 dancers there are all kinds of sexual offenses that occur in, around and near
 those establishments. So I would -- my opinion is that it's an undue danger we
 don't need to try to figure out if it's dangerous or not.
 

On cross-examination, however, Clark testified that he had no knowledge of
any increase in the crime rate surrounding the existing north Arlington Hooters,
and he agreed that whether or not Hooters served alcohol, the potential problems
with sex offenders could still occur. Clark agreed that his complaint was with
the location of the Hooters in south Arlington and not with the fact that it
wanted to sell alcoholic beverages. On redirect, however, Clark testified that
the use of alcohol decreases a person's ability to restrain himself in acting
out sexual fantasies.
Dr. Wade Hemminger, who is an Arlington resident, a licensed, psychotherapist
with twenty-five years of experience, and a university professor, also testified
for the protestors. In his private practice, Dr. Hemminger deals mostly with
people with sexual and alcohol addiction problems. Similar to Clark, Dr.
Hemminger had worked with many patients who had sexual disorders and a high
percentage who were sexual addicts. Dr. Hemminger testified that his problem
with the proposed Hooters restaurant "is focused on the use of alcohol and
the problems it produces." Dr. Hemminger "agree[d] with . . . Clark
that inviting alcohol or any mood alternate [sic] substance makes it even more
difficult to control other types of compulsive behaviors like sexual
disorders." Dr. Hemminger testified that while there are some businesses on
the frontage road to IH-20 at the proposed location for the south Arlington
Hooters, the area is primarily residential with churches and schools nearby.(7) 
Dr. Hemminger expressed his opinion that "the mix of alcohol, . . . [the]
presentation with all the materials that are being sold and the presentation of
this restaurant makes things very, very threatening." His concern was
"not only with the people who have a problem," but also "with the
younger people that might be affected by locating the restaurant" at this
particular location.
William Zedler, who was a twenty-two year Arlington resident and chairman of
Decency for Arlington, testified that the area of the proposed Hooters was a
"large residential area surrounding a neighborhood shopping center,"
which included businesses such as a grocery store, drug store, music store,
cleaners, model or craft store specializing in remote control toys, and other
restaurants. When asked to describe and compare some of the other restaurants in
the shopping center, Zedler listed Tai Pan Chinese, Ole' Mexican, Taco Bueno,
Colter's, and Khaki's and stated that all employ both male and female servers
who dress in casual daily attire. Zedler also agreed on cross-examination that
the area is zoned for the sale of alcoholic beverages and that Colter's,
Harrigan's, Cheddar's, The Old Mexican Grill, Steak and Ale, Mac's Bar and
Grill, The Seafood Cracker, and Mulligan's bar-all of which are located in the
same shopping center as the proposed Hooters-sell alcoholic beverages.
Zedler, who had also dined at a Hooters restaurant on two previous occasions,
testified that the servers' "outfits were skimpy," and that "it
was obvious that . . . the thing that was the attractiveness of the facility was
the sex appeal of the Hooters girls."(8) 
Zedler testified that people go to Hooters because of the sex appeal and further
testified that "[t]he next step of logic would say, would sexual deviance
[sic] and predators be attracted to the same thing?" Zedler then stated his
safety concern that allowing the proposed Hooters restaurant at that location
would be akin to "putting a magnet in a residential area where you have
small children and unescorted women," which would be "mix[ed] . .
.with alcohol." Zedler testified, "I think that's the major issue is
you're mixing this very salacious sexual atmosphere with alcohol and you're
putting it in a residential neighborhood." Zedler later stated his concern
that granting the alcoholic beverage license to the proposed Hooters would
"have a very destructive nature on the neighborhoods around
Arlington," could "start[] a slide for that area," and would be
"very dangerous."
Ron Wright, who lived within walking distance from the proposed Hooters site
and is an at-large member on the Arlington City Council, also testified against
the granting of the alcoholic beverage license. Wright testified that the area
in which Hooters proposed locating its new restaurant was "a family part of
town." He stated that within a two-mile radius, there are two high schools
and at least a dozen churches. Wright testified that the City of Arlington's
mission statement reflects the values adopted by the City Council and that the
city was committed to "providing an exemplary environment in which to live,
work, and play" and an environment that was peaceful, moral, and decent.
While Wright testified on cross-examination that he was not authorized to
speak on behalf of the entire Arlington City Council, he agreed that Arlington
zoning ordinances specifically permitted the sale of alcoholic beverages in the
area in which Hooters wanted to build its new restaurant. Wright also testified
that Arlington had passed ordinances concerning sexually oriented businesses but
that there were no zoning restrictions regarding "sexually suggestive
businesses," such as Hooters.
On direct, however, Wright asked the court to deny Hooters' application
because of his concerns that "mixing . . . alcohol with the sexual
stimulation that this restaurant markets," is a "volatile mix."
Wright testified,

         In the end, it's the people of
 the community, not their government that determine what a common community
 sense of decency is and based on the response that I've received as a
 councilman in letters, e-mails and phone calls, I would say that this would
 very definitely violate the community sense of decency that's been adopted in
 southwest Arlington.
 

Wright conceded that the existing north Arlington Hooters is within 1.9 miles
of a school and that there are a number of apartment residences in that area,
and he also conceded that he was not aware of anything indicating that the
location of the north Arlington Hooters had dramatically or negatively impacted
the morals or decency of life in the north Arlington area. Wright, however,
distinguished the area where the north Arlington Hooters was located by stating
that the area was "not a family part of town" because it is on the
edge of the festival district, down the street from the Ballpark in Arlington
and Six Flags Over Texas theme park.
Dr. Russell Barksdale, who is a pastor and a seven-year Arlington resident,
also testified against Hooters' application for an alcoholic beverages license.
Dr. Barksdale, who stated that he was testifying as a parent, a pastor, and a
citizen, opined that sexual addiction was "the fastest growing addiction in
our society," and it was being "exacerbated by alcohol." Dr.
Barksdale testified, "The problem I see with the Hooters in southwest
Arlington in addition to it being a blithe [sic] on our community is that it
preys on the weaknesses of men struggling in that area." After stating that
he had served on the long-range planning board for Arlington and on parent and
teacher organizations through the schools, Dr. Barksdale testified that
"the values that we strive to implement in [our] community are
diametrically opposed to the values that the Hooters organization
propounds."
Based on the evidence during the hearing, the county judge made the following
findings of fact and conclusions of law, which he later amended to provide
greater specificity:
FINDINGS OF FACT
               
. . . .


 6.        Located within a one and
 one-half to two mile radius of the proposed Hooters are twelve churches, and
 two high schools (Arlington Martin and Kennedale).
 7.        The shopping center is in a
 highly residential area with little other commercial development.
 
 . . . .
 
 10.        The "new" Hooters will
 be operated in the same manner as the other Hooters.
 11.        Hooters waitresses wear
 "standard attire consisting of [a] low cut "tank top" which
 accentuates cleavage, very short, tight orange shorts which can and do reveal
 the lower portion of the buttocks.
 12.        Hooters waitresses are, or can
 be, flirtatious with customers and it is part of the Hooter method or manner
 of doing business for the waitresses to use their sex appeal or allure to
 generate sales of alcohol, food and merchandise.
 13.        Hooters markets, both via its
 website and/or in the restaurant, numerous merchandise items bearing pictures
 of Hooters girls wearing swim wear in sexually alluring, stimulating or
 provocative poses. Such merchandise includes but is not limited to cups,
 playing cards, calendars, newsletters, magazines and computer screen saver
 disks.
 14.        Hooters advertises an
 opportunity for the public to "win" a date with a Hooters girl.
 15.        Hooters is not marketed as a
 family restaurant and earns about 70% of its revenue from males ages 25-54.
 16.        Hooters averages about 75% of
 its revenue from food sales and 25% from alcohol sales.
 17.        Persons on parole or
 probation as sex offenders are generally not to visit or frequent sexually
 oriented businesses nor posses sexually alluring, stimulating or provocative
 material.
 18.        Hooters restaurants and
 merchandise are the kind of places and materials sexual offenders should not
 visit or possess, but are of the type of places or material to which such
 offenders are drawn.
 19.        High school students may
 leave their campuses at lunch and could go to the Hooters without parental
 knowledge or consent.
 20.        The safety of young females
 who work at or frequent the shopping center could be jeopardized due to the
 sexual allure a Hooters poses to sexual offenders.
 21.        The local community sense of
 decency is contrary to the business method or manner of operation at the
 proposed location.
 22.        The existing restaurants or
 licensed to sell alcohol establishments in the immediate (1000 feet) vicinity
 are generally either family oriented or do not employ exclusively scantily
 clad young female waitresses.
 23.        There is a difference between
 Hooters manner of operation and other TABC licensed establishments in the same
 location. That difference is the widespread, pervasive and management condoned
 policy of using sex appeal to target a specific segment of the population to
 sell alcohol, food and merchandise.
 24.        This difference is an unusual
 circumstance.
 25.        The place of the proposed
 Hooters in a heavily residential area coupled with its sexually alluring
 suggestive or provocative manner of doing business does not comport with the
 local sense of decency or morals.

CONCLUSIONS OF LAW
        . . . .


 3.        Based upon Finding of Fact
 Numbers 10 to 18, the court has reasonable grounds to believe and has found
 that Hooters operates its business in a manner that emphasizes sexual allure,
 stimulation or provocation in the sale of alcohol, food and merchandise.
 4.        Based upon Finding of Fact
 Numbers 6, 7, 10 to 25, the court has reasonable grounds to believe and has
 found that the local community sense of decency is contrary to Hooters
 business method or manner.
 5.        Based upon Finding of Fact
 Numbers 19 to 20, the court has reasonable grounds to believe and has found
 that Hooters would pose a danger to the safety and welfare of local community
 youth, especially females.
 6.        Based upon Finding of Fact
 Numbers 22 to 24, the court has reasonable grounds to believe and has found
 that an unusual circumstance exists that makes Hooters at the proposed
 location different from other licensed restaurants at that location.
 7.        Based upon Conclusions of Law
 3, 4, 5, and 6, the place coupled with the manner in which the Applicant may
 conduct his business warrants a refusal of the license based upon the general
 welfare, morals, safety and sense of decency of the people.

D. Application of the Law to the Facts
Hooters contends that the district court properly overruled the county judge
because no substantial evidence justified the denial of Hooters' application for
an alcoholic beverage license. Hooters contends that there was no unusual
circumstance presented to justify the denial of the license given the fact that
Hooters is otherwise qualified to sell alcoholic beverages and intends to do so
in a proper location at which other businesses sell alcoholic beverages.
Further, after acknowledging that no exact test exists for a county judge to
find an unusual condition sufficient to justify the denial of an alcoholic
beverages license, Hooters asserts that the protestors have not proven that such
a condition exists at the site of the proposed south Arlington location. We
disagree.
While we acknowledge that the fact that a large number of an area's residents
protest the issuance of a permit is not of itself sufficient reason to deny an
application, in the case at bar, independent reasons existed to form the basis
for the county judge's denial of Hooters' application. See Mikulenka,
510 S.W.2d at 619 (holding that, in spite of a large number of protestors, there
was no substantial evidence of an unusual condition or situation in the record
to justify denial of an alcoholic beverage license). The facts of the case
before us are more similar to Brantley, in which the court of appeals
upheld the county judge's denial of a beer retailer's on-premise and late hours
license. 1 S.W.3d at 347-48.
In Brantley, the court held that the county judge's decision was
reasonably supported by substantial evidence, which revealed that the proposed
area of the club was in a noncommercial, residential area across the street from
the homes of eight families with several nearby schools. Id. at 345.
Additionally, the application was protested by concerned citizens, school
officials, and a county commissioner, who argued that the club would affect the
quality of life and the safety of children and adults in the area. Id.
In the case at bar, while the testimony indicates that the proposed south
Arlington Hooters would be in a shopping center, the county judge found that the
location is in a highly residential area with little other commercial
development. Further, the county judge focused on the sexually-themed nature of
Hooters' business and on its proposed location in south Arlington, and in its
amended findings of fact and conclusions of law, the county judge gave the
following justification for his refusal of Hooters' application:
The clear, credible and convincing evidence presented by Protestant's
witnesses in this case establishes beyond doubt that what is unique or unusual
about this case is the proposed location (in a general residential area) coupled
with the manner of operation (sexually alluring or stimulating). While there are
no statutory distance disqualifiers in this case, such as within 1,000 feet of a
church, the location is clearly within a well defined residential community with
churches and schools no more than one and one-half to two miles away. Since
there are other permitted restaurants in the same shopping center as the
proposed Hooters, there must be an unusual circumstance warranting denial of the
application.
This is the classic example of an appropriate unusual circumstance warranting
denial: Hooters' entire business methodology is predicated upon scantily clad,
attractive young women using their sex appeal to attract the targeted clientele
of young males to buy food, drink and sexually alluring or stimulating
merchandise.
This fact standing alone in a non-residential location, might not be
sufficient to warrant denial of the application. But, taken together the place
of operation coupled with the manner of operation clearly warrants refusal of
the license based upon the morals, safety and sense of decency of the people of
this community.
All the witnesses testifying for the Protestant establish that the
combination of alcohol and a sexually alluring or stimulating business such as
Hooters is different from any other family restaurant in the immediate area.
These witnesses also testified about the danger to the safety of young people
that could result given the propensity for sexual predators or offenders to seek
out the sexually alluring or stimulating. Finally, the testimony established
beyond doubt that a Hooters restaurant at this location would violate and be
detrimental to the sense of decency of the people of this community.
Without citing any authority, Hooters argues that the county judge was not
authorized to intermingle the "place" and "manner" licensing
criteria in section 61.42(a)(3). See Tex. Alco. Bev. Code Ann. §
61.42(a)(3). While we acknowledge that we have found no case in which a county
judge has based a refusal of an alcoholic beverage license on both the
"place" and "manner" criteria, we again reiterate that
section 61.42(a)(3) vests a county judge with great discretion to determine
whether the place or manner in which a business is operated jeopardizes the
general welfare, health, peace, morals, or sense of decency of the people. Id.;
see Brantley, 1 S.W.3d at 347; Four Stars Food Mart, Inc.,
923 S.W.2d at 272. Even if the district court found that evidence greatly
preponderated against the decision to deny Hooters' alcoholic beverages license,
so long as more than a scintilla of evidence existed in favor of its denial, the
decision of the county judge must stand. See Sierra, 784
S.W.2d at 361; Tex. Health Facilities Comm'n, 665 S.W.2d at 452.
We have reviewed the record of the administrative proceedings before the
county judge. While we do not consider whether the county judge's ruling was
correct, on the basis of the record before us, we hold that it was reasonable
for the county judge to refuse the application under section 61.42(a)(3). See
Tex. Alco. Bev. Code Ann. § 61.42(a)(3); Sierra, 784 S.W.2d at 361;
Sanchez, 96 S.W.3d at 489; see also Auto Convoy Co. v. R.R.
Comm'n of Tex., 507 S.W.2d 718, 722 (Tex. 1974) ("Where there is
substantial evidence which would support either affirmative or negative
findings, the order will be upheld, even though the [agency] might have arrived
at a decision contrary to that which the court might have reached.").
Because the county judge was exercising his administrative discretion under the
alcoholic beverage code and there was substantial evidence to support his
decision, we conclude that the district court erred in overruling his
determination and in substituting its own judgment for that of the county judge.
See Sierra, 784 S.W.2d at 361;Sanchez, 96 S.W.3d at
489. Accordingly, we sustain the TABC's sole issue.
IV. CONCLUSION
Having sustained the TABC's sole issue, we reverse the order of the district
court, and we render judgment that the order of the county judge denying
Hooters' application for an alcoholic beverage license is reinstated. See
Sanchez, 96 S.W.3d at 490.
 
  
                                                        ANNE
GARDNER
  
                                                        JUSTICE
 
PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

DELIVERED: June 26, 2003

1. See Tex. Alco. Bev. Code Ann. §§ 61.31,
61.32 (Vernon Supp. 2003).
2. Section 11.67(a) of the alcoholic beverage code
provides as follows:

 An appeal from an order of the commission or administrator refusing,
 canceling, or suspending a permit or license may be taken to the district
 court of the county in which the applicant, licensee, or permittee resides or
 in which the owner of involved real or personal property resides.

Tex. Alco. Bev. Code Ann. § 11.67(a) (Vernon 1995).
3. Hooters filed its original petition to review the order
denying alcoholic beverage license (Cause No. 236-191481-02) and then moved to
consolidate the case with Cause No. 48-190671-01, which was the pending case
before the 48th District Court. The two cases were consolidated on
February 19, 2002.
4. On March 4, 2002, Judge McCoy granted a new trial on
the court's own motion; however, three days later, Judge Crowley granted
Hooters' motion to vacate Judge McCoy's order. Neither side seeks our review
concerning these orders; thus, we confine our opinion to the TABC's evidentiary
issue.
5. See Live Oak Resort, Inc. v. Tex. Alcoholic
Beverage Comm'n, 920 S.W.2d 795, 798 (Tex. App.--Houston [1st
Dist.] 1996, no writ) (holding that, while any person may protest granting of
alcohol license, TABC is only proper party to suit seeking review of
administrative decision).
6. Leslie Recine also testified concerning petitions
collected in response to Hooters' application for an alcoholic beverage license.
Those petitions were not admitted into evidence, and that ruling is not
challenged on appeal.
7. On cross-examination, Dr. Hemminger agreed that there
are many commercial activities in the location around the proposed Hooters and
that the site is in one of the major commercial areas in the City of Arlington.
8. Zedler also stated, "They really did push the
alcohol," and his opinion was that the food "was just average quite
frankly."